UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOMNER OROZCO CARRETO, and CARLOS RAMIREZ )<br><br>Plaintiffs,<br><br>v.<br><br>Chicago Police Officers KEVIN BUNGE, Star #12973; *ANDREW PERWOZNIK*, Star #13800; *NIKKOLAI AZEVEDO*, Star # 11379; and CITY OF CHICAGO,<br><br>Defendants. | No. 21 CV 735<br><br>Hon. John J. Tharp, Jr., District Judge<br><br>Jeffrey T. Gilbert, Magistrate Judge<br><br>Jury Demand |

## *SECOND AMENDED* COMPLAINT[1]

1.  Defendant Officer Kevin Bunge, without cause or justification, discharged his firearm at Plaintiffs Jomner Orozco Carreto and Carlos Ramírez, in violation of Plaintiffs' constitutional right to be free from excessive force and unlawful seizures guaranteed by the Fourth Amendment to the U.S. Constitution, *and Defendants Officers ANDREW PERWOZNIK and NICCOLAI AZEVEDO falsely arrested both Plaintiffs, holding them for hours before releasing them with no charges*. Plaintiffs seek just compensation for the pain and suffering, mental

---

[1] Defendants have indicated in writing that they have no objection to Plaintiffs' filing this Second Amended Complaint.

1

anguish, humiliation, and other damages they suffered as a result of *these violations of their rights.*

## JURISDICTION AND VENUE

2. The jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 § 1983; the judicial code, 28 U.S. §§ 1331 and 1343(a); and the Constitution of the United States, and supplementary jurisdiction, as codified in 28 U.S.C § 1367.

3. Venue is proper in this District under 28 U.S.C. 1391(b). The parties reside in this judicial district and the events that are the basis of these claims occurred in this judicial district.

## PARTIES

4. Plaintiff Jomner Orozco is a resident of Chicago.

5. Plaintiff Carlos Ramírez is a resident of Chicago.

6. Defendant Bunge was, at the time of this incident, a duly appointed Chicago police officer. Defendant was acting under color of law and within the scope of his employment with the City of Chicago at the time of this incident.

7. Defendants *Perwoznik and Azevedo* were, at the time of this incident, duly appointed Chicago police officers, acting under color of law and within the scope of their employment with the City of Chicago.

8. Defendant City of Chicago is a municipal corporation, duly incorporated under the laws of the State of Illinois. It is the employer and principal of the Defendant Police Officers.

## FACTS

9. On the night of December 11, 2020, Plaintiff Orozco was driving his vehicle, while his friend Carlos Ramírez was riding in the passenger seat.

10. The two were driving to meet another friend of Mr. Orozco and were traveling west bound on West Irving Park, in Chicago, Illinois.

11. Mr. Ramírez was using the GPS on his phone to navigate and provide directions to Mr. Orozco.

12. Mr. Orozco questioned whether the GPS on Mr. Ramírez's phone was providing accurate directions and decided to pull over to safely use the GPS on his own phone.

13. Mr. Orozco pulled his vehicle to the side of the road on the 3300 block of West Irving Park Road.

14. Defendant Officer Bunge is a veteran of the United States Marine Corps, with combat experience, received an honorable discharge and has a 60% service-related disability. Defendant Officer Bunge had recently ended a shift as a Chicago police officer teaching the Use of Force at the Chicago Police Academy, and was sitting in a Sports Utility Vehicle (SUV) listening to an audiobook about the Battle of Fallujah, parked in front of Mr. Orozco's vehicle, further west on Irving Park.

15. Mr. Orozco and Mr. Ramírez sat in Mr. Orozco's legally parked vehicle while they attempted to confirm directions to their destination.

16. Defendant Officer Bunge exited the SUV, announced that he was a police officer, and, using a Chicago Police tactical approach, approached Mr. Orozco's vehicle acting as a Chicago police officer, holding a handgun and displaying a Chicago Police star.

17. Mr. Orozco and Mr. Ramírez had committed no crime, were unarmed, and posed absolutely no threat to Defendant Bunge or any other person.

18. Without cause or justification, Defendant Bunge pointed his firearm toward Mr. Orozco and Mr. Ramírez and fired at them multiple times.

19. Defendant Bunge used unreasonable force against Plaintiffs.

20. Mr. Orozco understood that their lives were in danger, so he rapidly reversed his vehicle and sped off to a safe location.

21. Defendant Bunge fired multiple shots, one of which struck Mr. Orozco in his hand, causing significant physical injury to two of the fingers on his right hand. A photo of Mr. Orozco's injury appears below.



22.     Glass from the shattered car window struck Mr. Ramírez in the face and the volume of the gunshots was so excruciatingly loud that it caused significant pain and hearing loss in his left ear.

23.     Defendant Officer Bunge called 911 after the incident and reported false information in an attempt to cover up his wrongdoing. Defendant Officer Bunge also provided false information for official Chicago Police Department reports, including a Tactical Response Report (TRR), in which he made false statements in an attempt to cover up his wrongdoing.

24. Defendant Officer Bunge fired rounds at Mr. Orozco and Mr. Ramírez that left bullet holes in Mr. Orozco's car and shattered the window of the vehicle. Photos of the damage to Mr. Orozco's vehicle appear below.





25. Defendants *Perwoznik and Azevedo* took Plaintiffs into custody.

26. Plaintiffs did not commit any unlawful act.

27. Defendants *Perwoznik and Azevedo* had no reasonable suspicion and no probable cause to arrest Plaintiffs.

## COUNT I
## 42 U.S.C. § 1983 Claim for Excessive Force and Unlawful Seizure

28. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

29. Defendant Bunge violated Plaintiff Orozco and Plaintiff Ramírez's rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from the use of excessive and unreasonable force and

7

unlawful seizure by aiming and discharging a firearm in their direction with no justification or reason.

30. Plaintiffs Orozco and Ramírez were injured as a result of Defendant Bunge's unconstitutional actions.

31. The unconstitutional actions of Defendant Bunge were the direct and proximate cause of Plaintiffs' physical injuries, pain and suffering, mental anguish and humiliation, damage to personal property and loss of personal freedom.

**COUNT II**
*42 U.S.C. § 1983 Claim for False Arrest*

32. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

33. The actions by Defendant Officers *Perwoznik and Azevedo* in falsely detaining, arresting, and imprisoning Plaintiffs without reasonable suspicion or probable cause violated Plaintiffs' Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure.

34. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

35. The actions of Defendant Officers *Perwoznik and Azevedo* were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

## COUNT III
### *42 U.S.C. § 1983 Monell Policy Claim*
### *Against Defendant City of Chicago*

36. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

37. The unconstitutional actions of Defendant Bunge, as alleged above, were done pursuant to one or more interrelated de facto policies, practices and/or customs of the Defendant City of Chicago, acting through and by its Police Department, Police Superintendents, Police Board, Mayors, and City Council.

38. At all times material to this complaint the Defendant City and its Police Department had interrelated de facto policies, practices, and customs which included, inter alia:

a) the failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers who commit acts of excessive force, including unjustified shootings;

b) the police code of silence;

c) the encouragement of excessive and unreasonable force;

d) the failure to properly investigate shootings of civilians by Chicago police officers;

e) the failure to properly discipline, monitor, counsel and otherwise control Chicago police officers who engage in unjustified shootings;

f) the failure to properly identify, screen, monitor, and treat Chicago police officers who suffer from mental health or psychological issues that could increase the likelihood that they will engage in unjustified shootings;

g) the failure to implement an effective "early warning system" or early intervention program that would identify and address officers at risk of engaging in unjustified shootings;

h) the failure to properly train and supervise Chicago police officers with regard to de-escalation tactics and strategies; and/or

i) the failure to properly train and supervise Chicago police officers in de-escalation techniques and policies.

39. On January 13, 2017, The Civil Rights Division of the United States Justice Department and the United States Attorney's Office for the Northern District of Illinois made the following findings as a result of a 13 month investigation of the Chicago Police Department:

a) CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable; (Report at 5)

b) CPD officers exhibit poor discipline when discharging their weapons and engage in tactics that endanger themselves and public safety, including failing to await backup when they safely could and should do so; (Id.)

c) CPD's pattern of unlawful conduct is due in part to deficiencies in CPD's training and supervision; (Report at 10)

d) CPD does not provide officers or supervisors with adequate training and does not encourage or facilitate adequate supervision of officers in the field; (Id.)

e) "CPD officers do not receive the quality or quantity of training necessary for their jobs. Pre-service Academy training relies on outmoded teaching methods and materials, and does not equip recruits with the skills, knowledge, and confidence necessary to serve Chicago communities. For example, we observed an Academy training on deadly force – an important topic, given our findings regarding CPD's use of force—consisted of a video made decades ago, which was inconsistent with both current law and CPD's own policies. The impact of this poor training was apparent when we interviewed recruits who recently graduated from the Academy: only one in six recruits we spoke with came close to properly articulating the legal standard for use of force. Post-Academy field training is equally flawed;" (Id.)

f) CPD officers use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by CPD (Report at 24).

40. Additionally, the Police Accountability Task Force, (PATF), commissioned by former Mayor Rahm Emanuel, of which current Mayor Lori Lightfoot was a member, in its Report entitled Police Accountability Task Force Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve, (hereinafter PATF Report) made, inter alia, the following findings:

11

a) Once an officer leaves the CPD Training Academy there is virtually no annual, mandated training. PATF REPORT, April 2016, p. 137, ¶1;

b) "It is critically important that all CPD officers approach each and every citizen encounter with an emphasis on respect and the sanctity of all life. That approach will avoid escalating even the most casual encounter. CPD officers must also seek to de-escalate situations so as to minimize the use of force. Minimizing the use of force not only prevents unnecessary injury and loss of life, it builds police legitimacy and trust." PATF REPORT, April 2016, p. 115, ¶1.

41. Defendant Officer Bunge used deadly force in an unreasonable and unjustified manner against Plaintiffs Orozco and Ramírez, who were both unarmed. Defendant Officer Bunge had not only completed the City of Chicago's inadequate training on Use of Force, but had been given the assignment by the City of Chicago to train other Chicago police cadets and officers on the Use of Force.

42. The policy, practice, and custom of a police code of silence results in police officers failing or refusing to report instances of police misconduct of which they are aware, including the unjustified discharge of an officer's weapon, despite their obligation under police regulations to do so, and also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability or criminal charges, in cases where they and their fellow

officers have used excessive force and/or engaged in unjustified shootings of civilians.

43. In *Obrycka v. City of Chicago*, 2012 WL 11047181 (N.D. Ill.), the longstanding and widespread CPD code of silence was again exposed when video tape and cellular phone evidence revealed Chicago police officers trying to cover up and conceal the brutal beating of a female bartender by an off-duty Chicago police officer within the City of Chicago. In 2012, the jury in Obrycka found that the City had either (1) a widespread custom or practice of failing to investigate and/or discipline its officers; (2) a widespread custom or practice of a police code of silence; or (3) both; and a judgment was entered against the City.

44. Police officers are educated at the CPD about the tenets of this code of silence. They are instructed: "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence." *Spalding v. City of Chi.*, 186 F. Supp. 3d 884, 902 (N.D. Ill. 2016).

45. The Police Accountability Task Force made the following findings concerning the CPD's code of silence:

13

a) "In December of 2015, Mayor Emanuel was asked if there is a 'code of silence' that exists among Chicago police officers. 'The short answer is yes,' he said." PATF REPORT, April 2016, p. 69, ¶7.

b) Superintendent Richard Brzeczek (1980-1983) "said that a code of silence 'has always existed in the police department' and Chief Eugene Williams stated that 'The way it is done on the streets is to protect and cover for your partner at all cost, even at the expense of sacrificing every ounce of one's integrity.'" PATF REPORT, April 2016, p. 70, ¶1

c) "The code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City." PATF REPORT, April 2016, p. 70, ¶2.

46. The DOJ investigation also confirmed that the code of silence pervades the CPD: "City, police officers and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence." One CPD sergeant informed DOJ investigators that "if someone comes forward as a whistleblower in the Department, they are dead on the street." The code of silence extends, as the DOJ found, to sergeants and other supervisors who take affirmative actions to cover up the misconduct of their subordinates.

14

47. The DOJ determined that the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth." This is because "officers do not believe there is much to lose by lying."

48. The fact that the aforementioned code of silence exists, and that its adverse impact is allowed to occur through the actions and inactions of high ranking police officials, including police Superintendents and Directors of O.P.S., I.P.R.A. and COPA, is also evidenced by the fact that while former Superintendent Martin, former O.P.S. Director Fogel, former Mayors Richard M. Daley and Rahm Emanuel and former O.P.S. Director Shines have all acknowledged publicly that they are aware of the existence of the custom and practice of a police code of silence, they or their successors have not acted to eliminate the code or to counteract its impact on police discipline, the use of excessive and deadly force, or the fabrication of evidence and false arrests and prosecutions.

49. The individual Defendant officers were certainly aware of the widespread code of silence within the Chicago Police Department. As such, they believed they could violate Plaintiffs' rights with impunity, including using unreasonable force, falsely arresting Plaintiffs when they committed no crime and were in fact victims, and making false statements in an attempt to cover up their wrongdoing.

50. Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, encouraged the Defendant officers to commit the aforesaid acts against

15

Plaintiffs, and therefore acted as the moving force behind, and were, separately together, direct and proximate causes to the injuries to Plaintiffs.

51. The policies, practices and customs encouraged, inter alia, the unreasonable shooting of civilians, police misconduct, the fabrication of evidence, the making of false statements and reports, and the code of silence, and were, separately and together, the moving force and a direct and proximate cause of the unconstitutional acts committed by the City Defendant in this case, and the injuries sustained by Plaintiffs.

## COUNT IV
## State Law Claim for Battery

52. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

53. The actions of Defendant Bunge were intentional acts which caused an unpermitted contact of a harmful and offensive nature, to which Plaintiffs did not consent, constituting battery under Illinois law.

54. Plaintiffs Orozco and Ramírez were injured as a result of Defendant Bunge's actions.

55. These actions of Defendant Bunge were the direct and proximate cause of Plaintiffs' pain and suffering, damage to personal property, mental anguish and humiliation, and loss of personal freedom.

56. The actions of Defendant Bunge were committed in a willful and wanton manner.

## COUNT V
### State Law Claim for Assault

57. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

58. The actions of Defendant Bunge were intentional acts which threatened to cause unpermitted contact of a harmful and offensive nature, and placed them in reasonable apprehension of such contact, to which Plaintiffs did not consent, constituting assault under Illinois law.

59. These actions of Defendant Bunge were the direct and proximate cause of Plaintiffs' pain and suffering, mental anguish and humiliation, and loss of personal freedom.

60. The actions of Defendant Bunge were committed in a willful and wanton manner.

## COUNT VI
### State Law Claim for Intentional
### Infliction of Emotional Distress

61. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

62. The conduct and actions of Defendant Bunge, set forth above, were extreme and outrageous, were done intentionally, willfully and wantonly, and/or knowing that there was a high probability that their conduct would cause Plaintiffs severe emotional distress as set forth above.

63. Plaintiffs Orozco and Ramírez experienced, and continue to experience, severe emotional distress as a result of Defendant Bunge's actions.

64. As a direct and proximate cause of the extreme and outrageous conduct of Defendant Bunge, Plaintiffs were injured and experienced severe emotional distress constituting intentional infliction of emotional distress under Illinois law.

## COUNT VII
### *State Law False Arrest Claim*

65. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

66. As described above, Defendant Officers *Perwoznik and Azevedo* falsely detained, arrested, and imprisoned Plaintiffs without reasonable suspicion or probable cause and without having reasonable grounds to believe that an offense was committed by Plaintiffs.

67. The misconduct in this Count was taken intentionally, with malice, willfulness, and reckless indifference to Plaintiffs' rights.

68. The actions of Defendant Officers were the direct and proximate cause of the violations of Plaintiffs' rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of personal freedom.

## COUNT VIII
### State Law *Respondeat Superior* Claim

69. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

70. Defendants Bunge, *Perwoznik and Azevedo*, at all times material to this complaint, an employee of the Defendant City of Chicago, acting within the

scope of *their* employment; and *their* acts, which violated state law, are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

## COUNT IX
## 745 ILCS 10/9-102 Claim Against
## Defendant City of Chicago

71. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

72. Defendant Officers Bunge, *Perwoznik and Azevedo* committed the acts alleged above under color of law and in the scope of employment as employee*s* of the City of Chicago.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court to enter judgment in their favor against Defendants Bunge and the City of Chicago, awarding compensatory and punitive damages, attorneys' fees and costs against him, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiffs demands a trial by jury on all counts, pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment to the United States Constitution.

Dated: November 16, 2021

Respectfully Submitted,
/s/ Brad J. Thomson
Brad J. Thomson
Jan Susler
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070
brad@peopleslawoffice.com

Attorneys for Plaintiffs